Donald PARKS, Appellant,

v.

HARRIS COUNTY CIVIL SERVICE COMMISSION, Harris County Sheriff's Department, and Sheriff Tommy Thomas, In His Official Capacity, Appellees.

No. 08–04–00223–CV.

Court of Appeals of Texas, El Paso.

Feb. 16, 2006.

G. Scott Fiddler, Law Office of G. Scott Fiddler, P.C., Houston, for appellant.

Lisa R. Hulsey, Assistant County Attorney, Houston, for appellees.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

This is an appeal from the trial court's order granting summary judgment in favor of Appellees, Harris County Civil Service Commission, Harris County Sheriff's Department, and Sheriff Tommy Thomas, in his official capacity ("Defendants") and the denial of Appellant Donald Parks' motion for summary judgment. Mr. Parks raises three issues on appeal: (1) whether the trial court erred in denying his motion for summary judgment and granting the Defendants' motion for summary judgment; (2) whether the trial court abused its discretion in denying his motion to compel responses to written discovery; and (3) who are the proper parties to an appeal from a Civil Service Commission decision. We affirm.

Donald Parks was terminated by the Harris County Sheriff's Department ("the Department") on February 7, 2001, for unprofessional conduct. Mr. Parks appealed his termination to the Harris County Sheriff's Department Civil Service Commission ("the Commission"). After a hearing on September 25, 2002, the Commission determined that the termination was not supported by sufficient evidence. The Commission overturned Mr. Parks' termination and ordered that he be reinstated immediately to his previous position of deputy sheriff without back pay. The Department was instructed to "comply with all TCLEOSE [Texas Commission on Law Enforcement Officer Standards and Education] rules and regulations to bring Mr. Park's [sic] Texas Peace Officer's License to current and activated status." Further, the Commission stated, "Mr. Parks' return to work is contingent upon successful completion of return to duty testing as set forth in Chapter II Section 4.9 of the Harris County Sheriff's Office Department Manual."

Mr. Parks requested clarification on the Commission's return to work order. At a hearing on November 11, 2002, Mr. Parks requested a waiver or special dispensation from the 1.5 mile run portion of the physical agility test, a test which was part of the return to duty testing for employees who had been absent for more than one year. After deliberation, the Commission determined that Mr. Parks was required "to take all of the tests that are required by the Sheriff's manual." By letter dated November 13, 2002, the Commission confirmed its ruling that "Mr. Parks' return to work is contingent upon successful completion of all return to duty testing as set forth in Chapter II Section 4.9 of the Harris County Sheriff's Office Department Manual."

The Department ordered Mr. Parks to see Dr. Charles B. Covert, a board certified psychiatrist and licensed law enforce-

ment officer, for a psychiatric evaluation. On January 15, 2003, Dr. Covert evaluated Mr. Parks. Based on his evaluation, Dr. Covert concluded that Mr. Parks was "not in satisfactory psychological and emotional health to perform the duties, accept the responsibilities and meet the qualifications established by the Harris County Sheriff's Department." Dr. Covert reported his negative finding for Mr. Parks on a TCLEOSE form, Declaration of Psychological and Emotional Health, § 217.1, or "L–3" form. According to the Department, Dr. Covert's negative L–3 finding made Mr. Parks ineligible for reinstatement. Mr. Parks had been temporarily placed on the payroll during his return to duty testing. By letter dated February 17, 2003, Mr. Parks was terminated from the Department based on the unsatisfactory psychological evaluation. Mr. Parks appealed the second termination to the Commission.

Mr. Parks obtained a second opinion regarding his psychological evaluation from Dr. Rion Hart, a clinical psychologist. On February 20, 2003 and March 4, 2003, Dr. Hart conducted an evaluation of Mr. Parks. Based on Mr. Parks' twenty years in law enforcement and no contradictory information, Dr. Hart concluded that Mr. Parks possessed "a suitable level of emotional and psychological stability to adequately perform the duties of a law enforcement officer."

On May 21, 2003, the Commission conducted a hearing on Mr. Parks' termination. After deliberation, the Commission upheld the Department's decision. The Commission later issued its written order on May 22, 2003. In the order, the Commission found that Mr. Parks had violated the rules of the Sheriff's Department and therefore, it was upholding Mr. Parks' termination.

Pursuant to Section 158.037, Mr. Parks appealed the Commission's decision to the 269th Judicial District Court of Harris County, Texas. *See* TEX.LOC.GOV'T CODE ANN. § 158.037 (Vernon 1999). In his petition, Mr. Parks asserted that the Commission ruled in excess of its authority. In response, the Defendants filed an answer and a motion for summary judgment, contending that substantial evidence existed to sustain the Commission's decision.[1] Mr. Parks filed a cross-motion for summary judgment, arguing: (1) that the Commission's decision should be reversed because Dr. Covert's report should have been excluded as it was obtained in violation of the Department's written policy in its manual, which stated that he could see the doctor of his choice, thereby prejudicing a substantial right; and (2) that substantial evidence did not support the Commission's decision. Mr. Parks also argued that the trial court's denial of essential discovery had precluded him from proving a violation of his constitutional right to due process. Mr. Parks requested that in the event his motion for summary judgment was denied, the trial court vacate its previous order to compel discovery of certain information he sought. Both parties filed replies and supplemental responses to the respective motions.

On June 1, 2004, the trial court granted the Defendants' motion for summary judgment, upholding the Commission's decision and dismissing the Harris County Sheriff's Department as *non sui juris*. That same date, the trial court denied Mr. Parks' motion for summary judgment.

1. The Defendants also argued that the Harris County Sheriff's Department was *non sui juris* with no legal capacity to sue or be sued, and therefore was entitled to summary judgment as a matter of law on all of Mr. Parks' claims.

In his first issue, Mr. Parks argues that the trial court erred in denying his motion for summary judgment and granting the Defendants' motion. Specifically, he contends that the trial court erred in determining that there was substantial evidence to support the Commission's decision. He also contends that the trial court should have reversed the case because the Commission violated Section 158.0121 of the Texas Local Government Code by considering Dr. Covert's report, which Mr. Parks asserts was obtained in violation of the Department's procedures, therefore, the Commission's decision resulted from an improper procedure which implicated and prejudiced his substantial right to see a physician of his choice under the Department's policy.

### Standard of Review

■ A trial court must review a decision by a civil service commission under the substantial evidence rule as provided under Section 158.0121. *See* TEX.LOC.GOV'T CODE ANN. §§ 158.037(a) & (b), 158.0121 (Vernon 1999); *see also Bexar County Civil Serv. Comm'n v. Casals*, 63 S.W.3d 57, 59 (Tex.App.-San Antonio 2001, no pet.); *Bustamante v. Bexar County Sheriff's Civil Serv. Comm'n*, 27 S.W.3d 50, 51 (Tex. App.-San Antonio 2000, pet. denied). Under the substance evidence rule, the trial court hears and considers evidence to determine whether there exists reasonable support for the Commission's decision, however, the Commission itself is the primary fact-finding body. *See Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex.1984).

■ Whether the Commission's decision was supported by substantial evidence is a question of law. *See id.; Arrellano v. Texas Employment Comm'n*, 810 S.W.2d 767, 770 (Tex.App.-San Antonio 1991, writ denied). Substantial evidence is more than a mere scintilla of evidence, but less than a preponderance of the evidence. *Casals*, 63 S.W.3d at 59. As a result, the evidence supporting the Commission's order may preponderate against the Commission's decision and still amount to substantial evidence. *Id.* The reviewing court, whether the district court or the court of appeals, may not set aside the Commission's decision because it would reach a different conclusion; it may only do so if that decision was made without regard to the facts or the law and thus, was unreasonable, arbitrary, or capricious. *Casals*, 63 S.W.3d at 59–60; *see also Brinkmeyer*, 662 S.W.2d at 956 (the reviewing court is concerned only with the reasonableness of the administrative order, not its correctness).

■ Courts may grant summary judgments in cases tried under the substantial evidence rule. *See Cruz v. City of San Antonio*, 424 S.W.2d 45, 47 (Tex.Civ. App.-San Antonio 1968, no writ). We review the trial court's summary judgment *de novo*. *See Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 602 (Tex.App.-San Antonio 1995, writ denied). Summary judgment is proper when the movant establishes there is no genuine issue of material fact and he is entitled to judgment as a matter of law. *See* TEX.R.CIV.P. 166a(c); *Nixon v. Mr. Property Management Co., Inc.*, 690 S.W.2d 546, 548–49 (Tex.1985). When, as here, both parties move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex.2000); *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988). When reviewing cross-motions for summary judgment, we may render the judgment that the trial

court should have rendered. *FM Props. Operating Co.*, 22 S.W.3d at 872.

### Substantial Evidence

We will first consider whether or not there was substantial evidence to support the Commission's decision. The summary judgment evidence included the transcript and exhibits from the May 21, 2003 hearing before the Commission. At the commission hearing, Major Candy Henderson testified that as supervisor of the Human Resources Bureau, she oversees personnel leave, payroll, and employee hiring issues for the Department. Major Henderson explained that the Department as well as the State requires sworn peace officers to undergo psychological testing. Under Departmental policy, if an employee has been absent for over a year, that employee is required to undergo almost the entire re-application process, including physical abilities testing, psychological testing, drug testing, and firearms testing. The Department ordered Mr. Parks to see Dr. Charles Covert for the psychological evaluation. Dr. Covert issued a negative L–3 declaration of psychological and emotional health. Mr. Parks' termination was based on his failure to comply with Chapter II, Section 4.9 (Return to Duty After an Extended Absence) of the Department's manual. According to Major Henderson, there is nothing in the Department's policy that says Mr. Parks has the right to choose his examiner for the psychological evaluation.

The Department introduced into evidence Dr. Covert's negative L–3 declaration and the psychological evaluation he provided to the Department.[2] In his report, Dr. Covert stated Mr. Parks' psychological testing results as follows:

Mr. Parks took the *Millon–II*. These results show that Mr. Parks' responses suggest not only an effort to present a socially acceptable front, but also an intense resistance to admitting personal short-comings. His profile indicated anxious conformity and fear of ridicule and contempt in an individual who fears making mistakes with marked self-doubts and deflated self-esteem which may result in a general seeking of a supportive partner or institution such as his place of work or his church. There was an apparent overconcern [sic] with minor irrelevancies and preoccupation which serves to distract his attention from intense feelings of anxiety and inadequacies. There were indications of both obsessive-compulsive and dependent personality traits. On the *Sacks Sentence Completion Test*, # 15, he wrote, 'I would do anything to forget the time I got fired.' On item # 30, he said, 'My greatest mistake was getting fired.' On item # 60 he said, 'The worst thing I ever did was quit school.'

On the *Guilford–Zimmerman Temperament Survey* summary, Mr. Parks described himself as so friendly that he would find it difficult to prevent others from taking advantage of him. He described a great need to please others and to avoid unpleasantness. He indicated he almost never becomes angry no matter what the provocation. The results indicate that this person would find it extremely difficult to punish or discipline people, even if it were in their best interest. An individual who is this friendly is best suited for jobs that call for a desire to help, friendliness, a pleasant temperament and other factors. However, the results further describe that *'an individual who is this friendly should not be placed in a job that calls for exercising authority, the ability to criticize others, disciplining others,*

**2.** Dr. Covert did not testify at the commission hearing.

*fighting, arguing, competitiveness, managerial skills and law enforcement.'* [Emphasis in original].

Mr. Parks also disclosed to Dr. Covert that he had undergone psychiatric treatment for depression and had received Zoloft, an antidepressant medication, as well as Lorzapam, a minor tranquilizer.

Dr. Covert made the following conclusions and opinions based on his background, training, and experience as a board certified psychiatrist and a licensed law enforcement officer:

> Mr. Parks is not in satisfactory psychological and emotional health to perform the duties, accept the responsibilities and meet the qualifications established by the Harris County Sheriff's Department. He describes a pattern of repeated breach of department policies and procedures combined with a marked and demonstrated deceptiveness and evasiveness. Further, he demonstrates a lack of insight as well as impaired judgement which, should he be rehired, would make continuing and further breaches of policies and procedures foreseeable. Further, is a pattern of behavior, both privately and professionally, which demonstrates the inability or unwillingness to accept responsibility. This pattern of behavior has brought about consequences which show some continuity, that is, failing to meet his responsibilities to provide child support followed by having to be court-ordered to do so and failing to follow the policies and procedures of his department followed by a succession of complaints and disciplinary actions. Further, his tendencies to be deceptive, evasive, to deny and to rationalize his inability or unwillingness to meet the minimum standards of both personal and professional behavior are further indications of unsuitability for any law enforcement position. Also, his tendency to blame others for his shortcomings, whether blaming former wives or former employers, is further indication of a pattern of unwillingness to accept responsibility. The producing cause of these problems is Mr. Parks' mixed personality disorder with prominent antisocial, dependent and obsessive compulsive personality traits, DSM IV Code 301.9.

Following Dr. Covert's negative evaluation, Mr. Parks requested a second opinion from Dr. Rion Hart, a clinical psychologist. Dr. Hart testified that he met with Mr. Parks twice. In evaluating Mr. Parks, Dr. Hart conducted a standard L–3 evaluation, which included discussing the purpose and procedures of the evaluation. He recalled interviewing Mr. Parks for forty-five minutes to an hour to obtain background information, including his developmental history, marriage, social life, and work history. Dr. Hart then administered the Minnesota Multiphasic Personality Inventory–2 (MMPI–2), a pathological test, and the Clinical Analysis Questionnaire, which is designed to factor out all the primary personality faulty characteristics that can be limited into sixteen. Dr. Hart also reviewed records Mr. Parks had provided, including exhibits related to the disciplinary action and suspension and his personnel evaluation reports over a ten-year period.

Dr. Hart explained that in this case, the validity of the tests indicated that Mr. Parks was not forthcoming and made an effort to not fully represent his personality functioning or characteristics, which Dr. Hart thought was not particularly unusual for any police officer candidate being evaluated for an L–3 and was common in people who are undergoing an evaluation of this nature with their job on the line.

With regard to Mr. Parks' emotional functioning, Dr. Hart found that the testing results were negative for any significant indicators of psychopathology or psychological problems. Mr. Parks did receive an extreme score on one scale which is associated with a tendency to be enthusiastic, happy-go lucky, and impulsive. Dr. Hart stated that such individuals are found to be extroverts and bold in their approach to life as well as thick-skinned and warmly social. The more negative characteristics are passivity, flightiness, and unrestrained self-centeredness. According to Dr. Hart, these individuals can fail to be reliable or dependable. However, they also answer items that indicate an above average of maturity and emotional stability with the ability to remain in control over their emotions. Dr. Hart did not detect any indication of an underlying hostility, aggressiveness, or anti-social characteristics in Mr. Parks. There was also no indication that Mr. Parks suffers from guilt or self-doubt; rather Dr. Hart found that Mr. Parks was generally satisfied with himself.

In terms of his interpersonal functioning, the testing indicated that Mr. Parks is emotionally composed without any sense of superficial abnormality. He is generally trusting of others and seeks to get along. Dr. Hart also found that he appears to possess a general sociability and prefers to be a member of a group and involved in social interchange. The tests indicated that Mr. Parks can be lacking in polish or diplomacy in dealing with others in that he has a tendency to be forthright and unpretentious. According to Dr. Hart, the positive side of this characteristic was that Mr. Parks is not likely to be manipulating in his interactions, but the negative side is that he may be somewhat unskilled in carefully analyzing others' motives and the impact of his behavior on them.

Dr. Hart concluded that while Mr. Parks has some potential difficulty answering to some evidence about flightiness or impulsivity, this did not indicate a degree of emotional imbalance or a lack of emotional health or emotional personality characteristics that would by themselves interfere with him continuing to perform his duties as he has in the past. Dr. Hart also concluded that Mr. Parks' evaluation did not reveal any significant indicators that would out and out prevent him from working in law enforcement. Dr. Hart did qualify his interpretation of the testing results in that they were not fully revealing in some areas of his functioning and may not have been adequately identified.

Dr. Hart described the Millon II test as a test that is directly connected to the diagnostics manual used to diagnose psychological and psychiatric disorders. The test is similar to the one that Dr. Hart administered, the MMPI–2, which is often used for the same purpose. According to Dr. Hart, the Millon is known in the testing community for overstating psychopathology, but otherwise, it is a good test if used judicially. Dr. Hart explained that the Guilford–Zimmerman Temperament Survey is a non-pathologic test that looks at various temperaments or personality traits or characteristics in individuals. Dr. Hart agreed that since he and Dr. Covert used different tests, Dr. Covert's results could be correct based on his examinations. Dr. Hart has never used the Sacks Sentence Completion Test, but would be surprised if a person who is attempting to get his job back did not provide answers relating to his firing and his lack of employment because that should be what is on the person's mind.

In some respects, Dr. Hart agreed with Dr. Covert's report. Dr. Hart believed there were areas of overlapping in the

testing, but he did not agree with Dr. Covert's diagnosis of Mr. Parks as having an emotional or personality disorder. In Dr. Hart's opinion, Mr. Parks is psychologically and emotionally fit to perform the duties of a law enforcement officer. In this case, Dr. Hart considered the emotional and personality characteristics indicated in the testing to be of secondary importance given Mr. Parks' twenty years of past behavior as a veteran officer, which Dr. Hart believed was the best predictor of Mr. Parks' future behavior. Dr. Hart acknowledged that he was not aware that Mr. Parks had been diagnosed with depression in the past and had received treatment, but agreed that this would be relevant when making a psychological evaluation.

Mr. Parks testified at the commission hearing about his psychological testing with Dr. Covert. According to Mr. Parks, the session lasted nine hours and fifty minutes, during which time he took four tests and had a brief twenty-minute conversation with Dr. Covert. Mr. Parks spent five or six hours of that time in waiting rooms. Mr. Parks requested a lunch break several times, but was told the doctor would be with him shortly so he just waited. Mr. Parks stated that he was not trying to be deceptive in failing to list his previous three places of employment because he went back thirty years in his response. Mr. Parks described being badgered by Dr. Covert about previous terminations. The Commission sustained the objection to Mr. Parks' testimony that Dr. Covert threatened to flunk him for being deceptive, yelled at him, and slammed desk drawers. After the brief conversation, Dr. Covert told the secretary to administer more tests. Half way through the test, Mr. Parks was told to leave the room and was put in a closet to finish the test. Mr. Parks maintained that he was completely honest and fully disclosed information to Dr. Covert during his evaluation.

■ In reviewing the record, it is clear that Dr. Hart controverted many of Dr. Covert's opinions in his psychological evaluation of Mr. Parks. For instance, Dr. Covert described Mr. Parks as having a mixed personality disorder with prominent, anti-social, dependent, and obsessive compulsive personality traits. In contrast, Dr. Hart found no significant indicators of psychopathology or psychological problems and detected no indications of an underlying hostility, aggressiveness, or anti-social characteristics in Mr. Parks. According to Dr. Covert, Mr. Parks' test results indicated a degree of friendliness that would make it extremely difficult for such a person to punish or discipline others, even if it were in their best interest. While Dr. Hart similarly found that Mr. Parks received an extreme score on a scale associated with a tendency to be enthusiastic, happy-go lucky, and impulsive, such individuals can also be extroverts, thick-skinned, and warmly social. Such individuals can also have an above average maturity and emotional stability. Dr. Covert concluded that Mr. Parks was not in satisfactory psychological and emotional health to perform the duties, accept the responsibilities, and meet the qualifications established by the Harris County Sheriff's Department. On the other hand, Dr. Hart concluded that Mr. Parks' evaluation did not reveal any significant indicators that would out and out prevent him from working in law enforcement. Dr. Hart believed that Mr. Parks was psychologically and emotionally fit to perform the duties of a law enforcement officer, particularly given his twenty years of past performance as a veteran officer.

Under the applicable standard of review, the reviewing court cannot substitute its

judgment for that of the Commission. *See Casals*, 63 S.W.3d at 59–60. In this case, there is more than a mere scintilla of evidence to support the Commission's decision to uphold Mr. Parks' termination for violation of the rules contained in the Department's manual. As the primary fact finder, the Commission apparently resolved the conflicting evidence against Mr. Parks and chose to believe Dr. Covert's negative psychological evaluation. Thus, we cannot agree with Mr. Parks' contention that the Commission's decision was made without regard to the facts, and as such, was unreasonable, arbitrary, or capricious. *See Casals*, 63 S.W.3d at 59–60.

Mr. Parks also contends that it is important to consider the Department's violation of its own policies and procedures when it required him to see Dr. Covert instead of a doctor of his choosing as part of our substantial evidence review. Relying on *City of San Antonio v. Flores*, 619 S.W.2d 601, 602 (Tex.Civ.App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.), Mr. Parks argues that because his termination resulted from the Department's violation of its own written policy, there is no substantial evidence to support his termination. Mr. Parks' reliance on *Flores*, however, is misplaced.

In *Flores*, a fireman was dismissed from the San Antonio Fire Department based on two allegations: a violation of the sick leave policy and a violation of the civil service rules requiring good moral character. *Flores*, 619 S.W.2d at 602. The Firemen's and Policemen's Civil Service Commission upheld the fireman's indefinite suspension, but the trial court reversed the Commission. *Id.* The *Flores* Court affirmed the trial court's decision that there was no substantial evidence to support the Commission's decision. *Id.* at 603. Specifically, the *Flores* Court noted that the evidence showed that the fireman was off-duty and that, "in practice, a fireman on

sick or injury leave is not required to be at home when his shift is not on duty." Thus, the Court concluded that the Commission's finding that the departmental rule was violated was not reasonably supported by substantial evidence in the trial court. *Id.* With regard to the another allegation, the Court found the only evidence supporting the allegation to be incredible and contradictory to the other sixteen witnesses called to testify on behalf of the fireman. *Id.*

Contrary to Mr. Parks' contention, the *Flores* Court did not reverse the Commission's decision because the fire department violated its own written policy. Rather, the *Flores* Court found there was no reasonable evidence to support the Commission's finding that the fireman violated the department's rule based on the evidence at trial. Unlike *Flores*, we find that in this case there was substantial evidence presented to support the Commission's decision to uphold Mr. Parks' termination for violation of the Department's rules.

### Violation of Section 158.0121

Within Issue One, Mr. Parks argues that even if substantial evidence supports the order, the trial court should have reversed or remanded the case pursuant to Section 158.0121 of the Texas Local Government Code because the Commission's decision resulted from an improper procedure which implicated and prejudiced a substantial right. Specifically, Mr. Parks contends that the Commission violated Section 158.0121 by considering Dr. Covert's report, which was obtained in violation of the Department's procedures under Chapter II, Section 4.9 of the Department's manual. Mr. Parks asserts that under Section 4.9, he had the right to see a doctor of his choice, but instead the Department required him to see Dr. Covert in violation of its own written policy.

We repeat the following procedural facts as they are relevant to resolution of Mr. Parks' particular complaint on appeal. On October 2, 2002, the Commission issued an order, finding that Mr. Parks' February 7, 2001 termination was not supported by sufficient evidence. The Commission overturned the termination and ordered immediate reinstatement of Mr. Parks to his previous position as deputy sheriff. The order also provided the following directives:

> The Harris County Sheriff's Department will submit the necessary paperwork/forms to the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE), which will reflect the same. The Harris County Sheriff's Department will comply with all TCLEOSE rules and regulations to bring Mr. Park's [sic] Texas Peace Officer's License to current and activated status. Deputy Parks is not awarded and **'Will Not'** receive back pay for the period of that the termination was in effect, i.e. from February 7, 2001, through September 26, 2002. Mr. Parks' return to work is contingent upon successful completion of return to duty testing as set forth in Chapter II Section 4.9 of the Harris County Sheriff's Office Department Manual. All records relating to this disciplinary action shall be removed from Mr. Park's [sic] file.[3] [Emphasis in original].

On February 17, 2003, the Department terminated Mr. Parks because he failed to complete Section 4.9 return to duty testing successfully by being declared not in satisfactory psychological and emotional health to serve as a Harris County Sheriff's Deputy as is required by TCLEOSE. In its final order, the Commission upheld Mr. Parks' termination based on violation of the rules contained in the County Sheriff's Department Manual.

■ Mr. Parks asserts that Dr. Covert's report was obtained in violation of the Department's policy, Section 4.9(C), which gave him the right to see a doctor of his choice. He contends that when the Commission relied upon that report, the Department's procedural violation became a procedural irregularity of the Commission, which requires reversal under Section 158.0121 because the Commission prejudiced his substantial right to see a physician of his choice. Under the Texas Local Government Code, even if substantial evidence supports the commission's order, the trial court is directed to reverse and remand the commission's decision if the petitioner's substantial rights have been prejudiced because the commission's findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the commission's authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary, or capricious, characterized by abuse of discretion, or clearly an unwarranted exercise of discretion.

*See* TEX.LOC.GOV'T CODE ANN. §§ 158.0121(2), 158.0371(a).

Section 4.9 of the Department Manual contains the procedures related to employ-

---

**3.** After a hearing for clarification on November 11, 2002, the Commission informed the parties that it had "determined that Mr. Parks' return to work is contingent upon successful completion of all return to duty testing as set forth in Chapter II Section 4.9 of the Harris County Sheriff's Office Department Manual."

ees returning to duty after an extended absence. Under Section 4.9(C), an employee seeking to return to active duty after an extended absence must provide documentation of proficiency to perform the duties of the previously held position. Specifically, Section 4.9(C) states:

Any employee seeking to return to active duty after an extended absence shall be required to provide documentation that he or she is physically and/or mentally capable to discharge the duties of the position to which he or she is returning. Such documentation is required regardless of the reasons for the leave. If the reasons for the leave were medical (sickness or injury), the documentation must be signed by an attending physician. If the reasons were not medical, the documentation may be signed by any physician.

Documentation must be provided before the employee will be allowed to return to duty. The forms to be signed by a physician are available from the Human Resources Bureau. No other releases will be accepted.[4]

In addition, Section 4.9(D)(1)(b) provides that any employee who is absent from active duty for any reason or combination of reasons for a period exceeding one year shall be required to *re-apply* for employment. The rule also states: "The application process will entail all testing currently required of applicants for the same position held by the employee prior to the absence." New, or initial, applicants for licensure must meet certain TCLEOSE standards and testing requirements as provided in Section 217.1 of the Texas Administrative Code. *See* 37 Tex.Ad-

MIN.CODE § 217.1 (2005). Among the requirements, new applicants must:

[B]e examined by a psychologist, selected by the appointing or employing agency, who is licensed by the Texas State Board of Examiners of Psychologists. The psychologist must be familiar with the duties appropriate to the type of license sought and appointment to be made. This examination may also be conducted by a psychiatrist. The appointee must be declared in writing by that professional to be in satisfactory psychological and emotional health to serve as the type of officer for which the license is sought within 180 days before the date of appointment by the agency.

*See* 37 Tex.Admin.Code § 217.1(12).

Further, to qualify for appointment after a 180–day break, TCLEOSE regulations require the agency to conduct a new declaration of psychological and emotional health. 37 Tex.Admin.Code § 217.7(e)(2).

Subsection I of Section 4.9, outlines the process for employees seeking to return to duty after extended absence. Specifically, Subsection I states the following:

An employee who has been absent for a period which exceeds (15) consecutive work weeks ... or six hundred (600) working hours, for any reason or combination of reasons must provide an appropriate release to return to duty *and* must undergo the required testing. [Emphasis added].

Clearly, Section 4.9 contemplates two separate and independent requirements for employees seeking to return to duty after an extended absence. First, the employee must obtain medical release docu-

---

4. Subsection G further details the documentation requirements, stating in part:

Employees shall obtain appropriate release forms from the Human Resources Bureau. The employee shall take the release forms

to the physician who will review the employee's job description and document whether the employee can perform the essential functions of the job, or whether the employee will require an accommodation.

mentation from a physician who has reviewed the employee's job description and can document that the employee is capable of discharging the duties of the position. Second, the employee must re-apply for his former position, and in that application process, he must undergo all the testing currently required of new applicants for the same position. Current TCLEOSE regulations require new applicants to submit to a psychological evaluation by a Department-selected psychologist or psychiatrist and upon examination obtain a satisfactory declaration of psychological and emotional health. Contrary to Mr. Parks' assertion, Section 4.9(C) simply does not provide him with a right to choose the doctor of his choice for purposes of satisfying the psychological evaluation requirement. Therefore, the Department did not violate Section 4.9(C) by requiring him to see Dr. Covert for the psychological examination required under the application process.

■ Moreover, even if we were to agree that the Department had violated its own policy, we are unpersuaded that the Department's policy violation became a procedural irregularity or unlawful procedure of the Commission by its reliance on the Covert report. By its plain reading, under Section 158.0121, the trial court considers only whether the petitioner's substantial rights were prejudiced because the commission's findings, inferences, conclusions, or decisions were made through unlawful procedure. *See* Tex.Loc.Gov't Code Ann. § 158.0121(2)(C); *see also Casals*, 63 S.W.3d at 60 (a trial court shall reverse or remand a case for further proceedings under Section 158.0121 if: (1) the *commission* committed one of the error listed in Section 158.0121; (2) a substantial right of the petitioner was implicated; and (3) that right was prejudiced by the error.). Thus, a trial court is not required to reverse the

Commission's decision for an unlawful procedure that occurred at the agency level; rather an unlawful procedure by the Commission itself provides the basis for a reversal. Based on this statutory interpretation, we cannot agree with Mr. Parks that the Department's violation of its policies and procedures and the Commission's consideration of the "fruit from this procedural violation" amounted to a procedural irregularity by the Commission.

Accordingly, we conclude the trial court did not err in granting the Defendants' motion for summary judgment and denying Mr. Parks' motion because the Defendants established, as a matter of law, that the Commission's decision was supported by substantial evidence and further, that the Commission had not committed any of the grounds for reversal listed in Section 158.0121. Issue One is overruled.

## MR. PARKS' REMAINING ISSUES

■ In Issue Two, Mr. Parks complains that the trial court abused its discretion in denying his motion to compel responses to written discovery designed to solicit information necessary to show a violation of his constitutional rights.

In Mr. Parks' motion to compel, he asserted that he had served on the Department and Sheriff Tommy Thomas, in his official capacity, Interrogatories Nos. 1–4 and Request for Documents Nos. 1–8, but they did not answer any substantive interrogatory and did not provide a single document in response. The Defendants specifically objected to Interrogatories No. 2, which sought the identity of all employees or applicants for employment with the Department who were instructed to see Dr. Covert to undergo a psychiatric evaluation from January 1, 1997 to the present, and Nos. 3 and 4, which sought the amount of money and the nature and value of the benefits Mr. Parks would have received

from his previous job. The Defendants had also objected to his eight requests for production of documents. In requests Nos. 1 and 6, Mr. Parks sought any documents and correspondence between the Sheriff's Department or any Harris County Department and Dr. Covert regarding Mr. Parks. Requests Nos. 2 and 3 sought documents that would indicate the amount of money and nature and value of benefits Mr. Parks would have received from his previous job. Requests Nos. 4 and 5 sought departmental manuals for the years 2002 and 2003. Requests Nos. 7 and 8 sought contracts between the Defendants and Dr. Covert, as well as reports issued by Dr. Covert concerning any employee or applicant for employment with the County, the Department, or any other Harris County Department for the last five years. In his prayer, Mr. Parks requested that the trial court order the Defendants to provide complete answers to the four interrogatories and the eight requests for production of documents.

The trial court entered an order on Mr. Parks' motion to compel, in which it "ORDERED that Defendants Harris County Sheriff's Department and Sheriff Tommy Thomas, in his official capacity, provide full and complete supplemental answers to Plaintiff Donald Parks' Interrogatories for interrogatory Nos. 2, 3, and 4 within five (5) [days] of this order." The trial court also ordered the Defendants to "provide full and complete supplemental responses and responsive documents to Plaintiff's Request for Production Nos. 1, 2, 3, 4, 5, 6, 7, and 8 within five (5) [days] of this order." The order, however, also contained sections with two columns designated as "Overruled" and "Sustained." The trial court placed check marks in both columns in reference to his rulings on Interrogatories Nos. 3 and 4 and Requests for Production Nos. 2, and 3 and wrote "in part" next to each check mark. The trial court also

placed a check mark in the "Overruled" column for Request for Production Nos. 4 and 5, and marked Interrogatory No. 2 and Request for Production Nos. 1, 6, 7, and 8 as "Sustained."

Despite the rather ambiguous check marks, the order nevertheless directs the Defendants to comply with all the discovery requests. Because the trial court's ruling on the motion appears to grant the relief requested and thus, is not adverse, Mr. Parks has failed to preserve any error for appellate review. *See* TEX.R.APP.P. 33.1. Issue Two is overruled.

In Issue Three, Mr. Parks requests clarity on the issue of who are the proper parties from a Civil Service Commission decision. Mr. Parks concedes that "[t]he parties do not dispute that the parties necessary to resolve the dispute were present." Mr. Parks is, in effect, seeking an advisory opinion as to whether Harris County would have been a proper party to the lawsuit as well. Because we are prohibited from rendering advisory opinions, we may not address the merits of Mr. Parks' third issue. *See* TEX.R.APP.P. 47.1; *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex.2000); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (1993)(courts have no jurisdiction to issue advisory opinions). Issue Three is overruled.

We affirm the trial court's judgment.